IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ELIZABETH ESCOBEDO, Individually and on Behalf of All Others Similarly Situated, | § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | CIVIL ACTION NO. 4:22-cv-00538 |
| ACE GATHERING, INC., | § § § | |
| *Defendant*. | § | |

---

**DEFENDANT ACE GATHERING, INC.'S
MOTION FOR SUMMARY JUDGMENT**

---

By: ___*/s/ Mark D. Temple*___
  Mark D. Temple, a*ttorney-in-charge*
  Texas Bar No. 00794727
  Southern District ID No. 19552
  Peter J. Stuhldreher, *of counsel*
  Texas Bar No. 24056393
  Southern District ID No. 699821
  Paul M. Knettel, *of counsel*
  Texas State Bar No. 24102031
  Southern District ID No. 3005240
  Emil M. Sadykhov, *of counsel*
  Texas Bar No. 24110316
  Southern District ID No. 3385031
  **BAKER & HOSTETLER LLP**
  811 Main Street, Suite 1100
  Houston, Texas 77002
  Phone: (713) 751-1600
  Facsimile: (713) 751-1717
  mtemple@bakerlaw.com
  pstuhldreher@bakerlaw.com
  esadykhov@bakerlaw.com
  pknettel@bakerlaw.com

  **ATTORNEYS FOR DEFENDANT,
  ACE GATHERING, INC.**

## **TABLE OF CONTENTS**

I.     INTRODUCTION ..................................................................................................1

II.    NATURE AND STAGE OF PROCEEDINGS ....................................................2

III.   ISSUES TO BE RULED UPON BY THE COURT............................................2

IV.    SUMMARY OF ARGUMENT ...........................................................................3

V.     STATEMENT OF UNDISPUTED FACTS .......................................................4

     A.     Ace is a Motor Private Carrier that Transports Crude Oil ......................................4

     B.     Plaintiffs' Employment as Crude Oil Drivers for Ace...............................................5

     C.     Plaintiffs, as Ace Crude Oil Drivers, Reasonably Expected to Drive Across State Lines...........................................................................................................................6

     D.     Crude Oil Transported by Plaintiffs Left Texas Prior to Being Refined ................9

          1.     Eagle Ford Crude ..........................................................................................9

          2.     WTI Crude ....................................................................................................11

VI.    ARGUMENT AND AUTHORITIES ................................................................12

     A.     Summary Judgment Standard .................................................................................12

     B.     Plaintiffs Were Exempt From The FLSA's Overtime Requirement Under the MCA Exemption.......................................................................................................13

          1.     Plaintiffs transported crude oil within a continuous flow of interstate commerce.......................................................................................................15

          2.     Plaintiffs reasonably expected to drive across state lines ..........................20

VII.   CONCLUSION..................................................................................................23

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allen v. Coil Tubing Services, L.L.C.*,
   755 F.3d 279 (5th Cir. 2014) ......................................................................15, 20, 21

*Amaya v. NOYPI Movers, L.L.C.*,
   741 F. App'x 203 (5th Cir. 2018) .....................................................................20, 21

*Baez v. Wells Fargo Armored Service Corp.*,
   938 F.2d 180 (11th Cir. 1991) .................................................................................16

*Bolar v. Southern Intermodal Xpress*,
   No. 1:17-00360-JB-B, 2019 WL 4738792 (S.D. Ala. Sept. 27, 2019)....................16

*Century Indem. Co. v. Carlson*,
   133 F.3d 591 (8th Cir. 1998) ...................................................................................19

*Craft v. Ray's, LLC*,
   No. 1:08-CV-627-RLY-JMS, 2009 WL 3163148 (S.D. Ind. Sept. 29, 2009).........19

*Edwards v. Aramark Unif. & Career Apparel, LLC*,
   No. 14 C 8482, 2016 WL 236241 (N.D. Ill. Jan. 19, 2016) ....................................19

*Galbreath v. Gulf Oil Corp.*,
   413 F.2d 941 (5th Cir. 1969) ........................................................................ *passim*

*Glanville v. Dupar, Inc.*,
   No. H–08–2537, 2009 WL 3255292 (S.D. Tex. Sept. 25, 2009) (Rosenthal, J.) ........15, 16, 20

*Levinson v. Spector Motor Serv.*,
   330 U.S. 649 (1947) .................................................................................................15

*Locas v. NOYPI, Inc.*,
   No. H–11–1940, 2012 WL 4754729 (S.D. Tex. Oct. 3, 2012)................................22

*Martinez v. Environmental Oil Recovery, Inc.*,
   No. 6:20-CV-00513-JCB-KNM ..........................................................................8, 14

*Olibas v. Barclay*,
   838 F.3d 442 (5th Cir. 2016) ............................................................................21, 22

*Opelika Royal Crown Bottling Co. v. Goldberg*,
   299 F.2d 37 (5th Cir. 1962) ........................................................................16, 17, 18

*Ragas v. Tennessee Gas Pipeline Co.*,
    136 F.3d 455 (5th Cir. 1998) ......................................................12, 13

*Ramos v. Captain Corp.*,
    No. MO:16–CV–00075–RAJ–DC, 2017 WL 3712345 (W.D. Tex. Jul. 7,
    2017) ............................................................................................22

*Rychorcewicz v. Welltec, Inc.*,
    768 Fed. App'x 252 (5th Cir. 2019) ................................... *passim*

*Rychorcewicz v. Welltec, Inc.*,
    No. H-16-2, 2018 WL 3559131 (S.D. Tex. Jun. 22, 2018) ..................23

*Songer v. Dillon Res., Inc.*,
    618 F.3d 467 (5th Cir. 2010) ........................................................22

*Swales v. KLLM Transp. Servs., L.L.C.*,
    985 F.3d 430 (5th Cir. 2021) ..........................................................2

*Vallejo v. Garda CL Southwest, Inc.*,
    56 F. Supp. 3d 862 (S.D. Tex. 2014) (Rosenthal, J.) ................... *passim*

## Statutes

29 U.S.C. § 207(a)(1) ........................................................................13

49 U.S.C. § 13102 .......................................................................13, 14

49 U.S.C. § 13501 ............................................................................14

Tex. Spec. Dist. Code §§ 5016.0001 *et seq.* (2021) ...................................9

## Regulations

29 C.F.R. § 782.2(b)(2) ....................................................................14

29 C.F.R. § 782.7(b)(1) ....................................................................16

Pursuant to Federal Rule of Civil Procedure 56, Defendant Ace Gathering, Inc. ("Ace") files this Motion for Summary Judgment seeking dismissal of Plaintiff Elizabeth Escobedo's and Opt-in Plaintiffs Jamey Alaniz, Matias Martinez, and Gene Lewis's (collectively, "Plaintiffs") claims for unpaid overtime pursuant to the Fair Labor Standards Act ("FLSA").

## I.       INTRODUCTION

Ace properly classified Plaintiffs, who worked for Ace as Crude Oil Drivers, as exempt from the FLSA's overtime pay requirement pursuant to the Motor Carrier Act ("MCA") exemption.  The MCA exemption applies to employees who are: (1) employed by a motor carrier or motor private carrier; (2) engaged in activities directly affecting motor vehicle safety; and (3) engaged in activities involving the transportation of goods in interstate or foreign commerce.

There is no dispute that the first two elements of the MCA exemption are met.  Plaintiffs challenge the third element solely on the basis that they only drove routes for Ace within the State of Texas.  Controlling case law, however, including several cases from this Court, establishes that Plaintiffs' argument is legally insufficient to survive summary judgment and that, despite Plaintiffs' intrastate trips, the interstate commerce element of the MCA exemption is met for two reasons, either of which is independently sufficient to establish Plaintiffs were exempt.  First, as Crude Oil Drivers, Plaintiffs transported goods in the flow of interstate commerce since the crude oil they transported from oil fields to pipelines in Texas filled allocations for Ace customers and was then transported by certain Ace customers or end-market users to destinations outside of Texas prior to it being refined or otherwise processed in any way.  Second, although Plaintiffs never drove outside of Texas during their employment with Ace, Plaintiffs unequivocally admit—and all of the relevant evidence confirms—that they had a reasonable expectation that they would have to make interstate trips in connection with their work as Crude Oil Drivers.  Thus, since Plaintiffs

indisputably were exempt under the MCA exemption, their FLSA claims fail as a matter of law and must be dismissed.

## II.      NATURE AND STAGE OF PROCEEDINGS

This is a suit to recover alleged unpaid overtime wages under the FLSA.  On February 18, 2022, Plaintiff Elizabeth Escobedo ("Escobedo") sued Ace, alleging that Ace misclassified her and other Crude Oil Drivers as exempt and, therefore, failed to pay them overtime for hours worked over forty in a week.[1]  Opt-in Plaintiffs Jamey Alaniz, Matias Martinez, and Gene Lewis ("Alaniz," "Martinez," and "Lewis," respectively) have filed consents to join the lawsuit.[2]

This Court held a Rule 16(b) scheduling conference on May 12, 2022, during which it directed Ace to file a motion for summary judgment regarding Plaintiffs' exempt status under the MCA exemption by August 19, 2022, in order to decide this dispositive issue prior to taking up collective action certification,[3] in line with the Fifth Circuit's recent guidance in *Swales*.[4]  Since then, the parties conducted discovery, including the exchange of numerous documents and Ace deposing each of the Plaintiffs.  Thus, Ace's motion for summary judgment is ripe for adjudication.

## III.      ISSUES TO BE RULED UPON BY THE COURT

The Court must decide whether Plaintiffs were exempt from the FLSA's overtime pay requirement under the MCA exemption during their employment with Ace as a matter of law.  A district court's grant of summary judgment is reviewed *de novo*.[5]

---

[1] *See generally* ECF No. 1, Plaintiff's Original Complaint.
[2] ECF Nos. 3, 8, and 20.
[3] *See* ECF No. 21, 22.
[4] *Swales v. KLLM Transp. Servs., L.L.C.*, 985 F.3d 430, 434, 441–42 (5th Cir. 2021) (instructing courts to "decide merits issues when considering the scope of a collective," explaining that "addressing these issues from the outset aids the district court in deciding whether notice is necessary").
[5] *Rychorcewicz v. Welltec, Inc.*, 768 Fed. App'x 252, 254 (5th Cir. 2019) (citing *Luv N' Care, Ltd. v. Groupo Rimar*, 844 F.3d 442, 446–47 (5th Cir. 2016)).

## IV.    SUMMARY OF ARGUMENT

Plaintiffs are former Ace Crude Oil Drivers who transported crude oil in large, 18-wheeler tanker trucks weighing over 10,000 pounds, from oil fields to pipelines in order to fulfill contracts with Ace's customers.  Ace buys, transports, and sells the crude oil to its customers and is, therefore, a "motor private carrier" within the meaning of the MCA.  Motor private carrier employees who perform safety-affecting duties on a motor vehicle used in transportation on public highways, like Plaintiffs who drove large crude oil tankers for Ace, are exempt from the FLSA's overtime requirements, even if they only drove intrastate routes, if they either (1) engage in the transportation of goods in the flow of interstate commerce; or (2) could reasonably be expected to drive across state lines.  Although meeting either prong independently establishes that such employees qualify for the MCA exemption, Plaintiffs actually meet <u>both</u>: (1) they transported crude oil to pipelines in Texas based on Ace's contracts with its customers, from which pipelines at least some of the crude oil was transported outside of Texas before the end-market users of the crude oil refined it or otherwise processed it in any way; and (2) they reasonably expected they could be required to drive across state lines—a fact Plaintiffs <u>unequivocally admitted</u> in their depositions and which is further confirmed by the facts that many Ace Crude Oil Drivers drove crude oil across state lines and that Ace's Crude Oil Drivers, including Plaintiffs, were required to drive whatever routes Ace assigned them each day.  As such, Plaintiffs were exempt from the FLSA's overtime pay requirement under the MCA exemption as a matter of law, and Ace is entitled to complete summary judgment in its favor.

## V.        STATEMENT OF UNDISPUTED FACTS

**A.      Ace is a Motor Private Carrier that Transports Crude Oil**

Ace buys crude oil and then transports it from oil fields to pipelines in order to fulfill contracts with its customers who have agreed to purchase crude oil from Ace.[6]  Ace's customers include companies that (1) trade crude oil on the export market for transport to countries outside of the United States, where the crude oil is ultimately refined; and/or (2) refine crude oil themselves, including using refineries located outside of Texas, such as in Louisiana or other locations throughout the United States.[7]  Ace's customers typically contract with Ace to have Ace deliver a certain number of barrels of crude oil to a particular pipeline on a monthly basis (referred to as an "allocation") and, based on Ace's deliveries, the customer is then entitled to take its contractually agreed number of barrels out of the pipeline terminal.[8]

In order to fulfill these allocation contracts with its customers, Ace buys the crude oil from crude oil producers.[9]  Then, one of Ace's Crude Oil Drivers drives a large, 18-wheeler crude oil tanker truck to the producer's oil field site, loads the purchased crude oil into the truck, transports it on public roads and highways to an injection point on a designated pipeline, and injects the crude oil into the pipeline.[10]  Specifically, the Plaintiffs in this case transported crude oil from oil field locations in Texas and injected that oil into pipelines in Texas.[11]  Importantly, as Plaintiffs admit, they did not refine, process, or otherwise alter the crude oil they transported for Ace in any way.[12]

---

[6] Ex. 1, Mitchell Decl. at ¶ 3; Ex. 2, Weise Decl. at ¶ 3.
[7] Ex. 1, Mitchell Decl. at ¶ 3; Ex. 3, Lopez Decl. at ¶ 11.
[8] Ex. 1, Mitchell Decl. at ¶ 4 Ex. 2, Weise Decl. at ¶ 3; Ex. 3, Lopez Decl. at ¶ 9; Ex. 4, Escobedo Dep. at 32:14–18; Ex. 5, Alaniz Dep. at 32:10–13; Ex. 6, Lewis Dep. at 29:1–16; Ex. 7, Martinez Dep. at 25:2–16 and 28:3–17.
[9] Ex. 1, Mitchell Decl. at ¶ 5; Ex. 2, Weise Decl. at ¶ 3.
[10] Ex. 1, Mitchell Decl. at ¶ 5; Ex. 2, Weise Decl. at ¶ 3; Ex. 4, Escobedo Dep. at 32:4–33:4; Ex. 5, Alaniz Dep. at 32:2–33:3; Ex. 6, Lewis Dep. at 28:11–29:16; Ex. 7, Martinez Dep. at 27:15–28:17. Thus, Ace earns revenue by buying and selling the crude oil its Crude Oil Drivers transport from the oil fields to the pipelines.  Ex. 1, Mitchell Decl. at ¶ 6.
[11] Ex. 1, Mitchell Decl. at ¶¶ 7, 13; Ex. 2, Weise Decl. at ¶ 6; Ex. 1-A to Ex. 1-D (Plaintiffs' Driver Activity Logs).
[12] Ex. 4, Escobedo Dep., at 33:5–34:14; Ex. 5, Alaniz Dep., at 33:4–34:3; Ex. 6, Lewis Dep., at 29:17–30:17; Ex. 7, Martinez Dep., at 28:18–29:4.

Ace is a registered motor carrier with the U.S. Department of Transportation ("DOT").[13] Therefore, its Crude Oil Drivers are all subject to DOT jurisdiction and regulations, including Commercial Drivers' License ("CDL") qualifications,[14] DOT hours of service and logging requirements,[15] and safety regulations.[16]

## B.    Plaintiffs' Employment as Crude Oil Drivers for Ace

Plaintiffs are former Texas-based Crude Oil Drivers for Ace.[17]  Escobedo worked for Ace from December 19, 2018, to January 24, 2022.[18]  Alaniz worked for Ace from May 10, 2019, to September 23, 2020.[19]  Martinez worked for Ace from July 4, 2020, to June 2, 2021.[20]  Lewis worked for Ace from November 16, 2018, to September 6, 2021.[21]  Plaintiffs worked only as Crude Oil Drivers and held CDLs with hazmat and tanker endorsements while employed by Ace.[22]

As Crude Oil Drivers, Plaintiffs' job was primarily to transport crude oil from the oil field to particular pipelines.[23]  Plaintiffs were paid a yearly salary and classified by Ace as exempt from overtime pay pursuant to the MCA exemption.[24]

---

[13]  Ex. 2, Weise Decl. at ¶ 4 & Ex. 2-A; Ace's DOT SAFER Company Snapshot, *available at* https://safer.fmcsa.dot.gov/query.asp?searchtype=ANY&query_type=queryCarrierSnapshot&query_param=USDOT&query_string=2565812 (last visited Aug. 18, 2022).  Ace's registration specifies that Ace operates "Interstate." *Id.*

[14]  Ex. 2, Weise Decl. at ¶ 5; Ex. 4, Escobedo Dep. at 16:4–17:7 and 19:23–20:3; Ex. 5, Alaniz Dep. at 20:1–6 and 23:6–12; Ex. 6, Lewis Dep. at 16:16–17:9; Ex. 7, Martinez Dep., at 14:21–15:16.

[15]  Ex. 2, Weise Decl. at ¶ 5; Ex. 4, Escobedo Dep. at 17:14–25, 44:3–10; Ex. 5, Alaniz Dep. at 20:18–2, 36:13–19, 49:2–6; Ex. 6, Lewis Dep. at 17:20–18:7, 31:22–32:4, 40:20–41:3; Ex. 7, Martinez Dep. at 16:6–13, 39:4–40:25.

[16]  Ex. 2, Weise Decl. at ¶ 5; Ex. 4, Escobedo Dep. at 15:19–16:2 and 35:8–36:2; Ex. 5, Alaniz Dep. at 18:10–19:5 and 36:6–19; Ex. 6, Lewis Dep. at 15:24–16:15 and 31:22–32:16; Ex. 7, Martinez Dep. at 14:10–20 and 30:14–31:2.

[17]  Ex. 2, Weise Decl. at ¶ 6; Ex. 4, Escobedo Dep. at 15:12–21, 23:4–6, 29:8–15; Ex. 5, Alaniz Dep. at 18:10–21, 25:17–20, 27:19–22; Ex. 6, Lewis Dep. at 15:24–16:8, 21:19–21, 23:20–22; Ex. 7, Martinez Dep. at 13:25–14:3, 19:11–14, and 23:12–14.

[18]  Ex. 4, Escobedo Dep., at 21:7–9 and 49:20–22.  Notably, only the time period after February 18, 2019 is potentially at issue in this case, based on the FLSA's limitations periods and when Escobedo filed her lawsuit.  *See* ECF No. 1.

[19]  Ex. 5, Alaniz Dep. at 25:4–7 and 57:19–22.

[20]  Ex. 7, Martinez Dep. at 18:24–19:5 and 41:1–5.

[21]  Ex. 6, Lewis Dep. at 21:11–13 and 48:21–23.  Again, only the time period after May 12, 2019 is potentially at issue in this case for Lewis, based on the FLSA's limitations periods and when Lewis joined the lawsuit.  *See* ECF No. 20.

[22]  Ex. 4, Escobedo Dep. at 18:4–20:3 and 23:4–6; Ex. 5, Alaniz Dep. at 21:3–23:12 and 27:19–22; Ex. 6, Lewis Dep. at 18:8–20:5 and 23:20–22; Ex. 7, Martinez Dep. at 16:14–17:11 and 23:12–14.

[23]  Ex. 2, Weise Decl. at ¶ 6; Ex. 4, Escobedo Dep. at 29:8–15, 29:22–30:4, and 32:14–25; Ex. 5, Alaniz Dep. at 29:14–30:8 and 32:10–33:3; Ex. 6, Lewis Dep. at 24:25–25:19 and 29:1–16; Ex. 7, Martinez Dep. at 28:3–6.

[24]  Ex. 2, Weise Decl. at ¶ 7; *see also* Ex. 4, Escobedo Dep. at 21:23–22:6; Ex. 5, Alaniz Dep., at 27:23–25; Ex. 6, Lewis Dep. at 24:6–8; Ex. 7, Martinez Dep. at 24:3–5.

As Plaintiffs admit, the crude oil they transported is a hazardous material, and their work involved safety-sensitive functions, including safely loading crude oil into their Ace tanker truck, safely driving Ace's large tanker truck on public roads and highways, and safely unloading crude oil from their Ace tanker truck at a pipeline injection point.[25]   Plaintiffs each admit that, if they failed to conduct any of these job duties safely, people could be seriously injured or even killed.[26] Plaintiffs also each acknowledge that the large crude oil tanker trucks they drove as Ace Crude Oil Drivers had Gross Vehicular Weight Ratings ("GVWR") of well over 10,000 pounds,[27] and that they drove those trucks on public roads and highways while transporting crude oil for Ace.[28] Plaintiffs further admit that, as Crude Oil Drivers at Ace, they were subject to DOT jurisdiction and regulations.[29]

## C.      Plaintiffs, as Ace Crude Oil Drivers, Reasonably Expected to Drive Across State Lines

At the outset of their employment with Ace, Plaintiffs each signed, and agreed to the terms of, employment offer letters from Ace ("Offer Letters").[30]   Each of Plaintiffs' Offer Letters specifically confirmed, in the first sentence, that Plaintiffs reasonably expected to drive interstate routes, if assigned, as part of their job duties as a Crude Oil Driver for Ace[31]:

---

[25] Ex. 4, Escobedo Dep., at 18:4–21 and 34:15–35:1; Ex. 5, Alaniz Dep., at 21:3–14 and 35:8–23; Ex. 6, Lewis Dep., at 18:8–16; Ex. 7, Martinez Dep., at 16:25–17:2 and 27:24–28:17.

[26] Ex. 4, Escobedo Dep., at 35:2–7; Ex. 5, Alaniz Dep., at 35:24–36:5; Ex. 6, Lewis Dep., at 31:16–21; Ex. 7, Martinez Dep., at 30:8–13.

[27] Ex. 2, Weise Decl. at ¶ 8; Ex. 4, Escobedo Dep., at 31:2–20; Ex. 5, Alaniz Dep., at 31:4–18; Ex. 6, Lewis Dep., at 27:22–28:2 and 31:5–15; Ex. 7, Martinez Dep., at 26:22–27:2.

[28] Ex. 2, Weise Decl. at ¶ 8; Ex. 4, Escobedo Dep., at 32:8–13; Ex. 5, Alaniz Dep., at 32:2–9; Ex. 6, Lewis Dep., at 28:20–25; Ex. 6, Lewis Dep., at 31:16–21; Ex. 7, Martinez Dep., at 27:15–17.

[29] Ex. 2, Weise Decl. at ¶ 5; Ex. 4, Escobedo Dep., at 15:19–16:2 and 35:8–36:2; Ex. 5, Alaniz Dep., at 18:10–19:5 and 36:6–19; Ex. 6, Lewis Dep., at 15:24–16:15 and 31:22–32:16; Ex. 7, Martinez Dep., at 14:13–20 and 30:14–31:2.

[30] Ex. 2, Weise Decl. at ¶ 9 and Ex. 2-B through Ex. 2-E (each Plaintiffs' offer letter); *see also* Ex. 4, Escobedo Dep., at 20:7–21:18 and 22:7–16; Ex. 5, Alaniz Dep., at 23:23–25:3 and 26:8–17; Ex. 6, Lewis Dep., at 20:10–21:10; Ex. 7, Martinez Dep., at 18:2–23.

[31] Ex. 2, Weise Decl. at ¶ 9 and Ex. 2-B through Ex. 2-E (each Plaintiffs' offer letter); *see also* Ex. 4, Escobedo Dep., at 20:7–21:18 and 22:7–16; Ex. 5, Alaniz Dep., at 23:23–25:3 and 26:8–17; Ex. 6, Lewis Dep., at 20:10–21:10; Ex. 7, Martinez Dep., at 18:2–23.

This employment offer as a professional driver, with expectations of intrastate state and interstate driving assignments, is presented to *Elizabeth Escobedo* with a start date on or about *12-19-18*,

This employment offer as a professional driver, with expectations of intrastate state and interstate driving assignments, is presented to *Samey Alaniz* with a start date on or about *5-10-19*,

This employment offer as a professional driver, with expectations of intrastate state and interstate driving assignments, is presented to *Steve Lewis* with a start date on or about *11-16-18*,

This employment offer as a professional driver, with expectations of intrastate state and interstate driving assignments, is presented to *MATIAS MARTINEZ* with a start date on or about *July 2. 2020*.

Each day they worked during their employment with Ace, Plaintiffs were assigned their routes via Ace's dispatch and were required to complete those assigned routes by picking up crude oil from a designated oil field site and transporting it to a designated pipeline injection point.[32] Plaintiffs' specific driving assignments varied and were regularly subject to change.[33]   In other words, Plaintiffs did not drive a dedicated route for Ace, nor were they able to choose what routes they drove for Ace from day-to-day.[34]   Instead, Plaintiffs were assigned their routes through Ace's dispatch based on Ace's customer needs, in Ace's sole discretion.[35]

Plaintiffs admit that they could not refuse to drive any route they were assigned, including an interstate route, and that they would risk termination or other discipline if they refused to complete an assigned trip.[36]   And, importantly, numerous Crude Oil Drivers for Ace, including other Texas-based Crude Oil Drivers, actually drove routes across state lines, including between

---

[32] Ex. 2, Weise Decl. at ¶¶ 10, 12; *see* Ex. 4, Escobedo Dep., at 30:11–13; Ex. 5, Alaniz Dep., at 39:7–14; Ex. 6, Lewis Dep., at 32:17–20 and 51:14–52:14; Ex. 7, Martinez Dep., at 31:3–12 and 32:9–33:23.

[33] Ex. 2, Weise Decl. at ¶ 10; Ex. 4, Escobedo Dep., at 36:25–37:2; Ex. 5, Alaniz Dep., at 40:2–8; Ex. 6, Lewis Dep., at 33:18–24; Ex. 7, Martinez Dep., at 33:3–23.

[34] Ex. 2, Weise Decl. at ¶¶ 10, 12; Ex. 4, Escobedo Dep., at 36:16–37:4; Ex. 5, Alaniz Dep., at 39:7–40:8; Ex. 6, Lewis Dep., at 33:6–24 and 52:6–8; Ex. 7, Martinez Dep., at 32:9–18.

[35] Ex. 2, Weise Decl. at ¶¶ 10–12; *see also* Ex. 6, Lewis Dep., at 32:17–20 (Q: "On any particular day during your employment with Ace, how did you know what loads of crude you were assigned to go pick up and deliver to a pipeline?" A: "I was sent a dispatch e-mail.").

[36] Ex. 2, Weise Decl. at ¶¶ 10, 12; Ex. 4, Escobedo Dep., at 36:16–24; Ex. 5, Alaniz Dep., at 39:7–40:1; Ex. 6, Lewis Dep., at 33:6–17; Ex. 7, Martinez Dep., at 32:19–25 and 35:15–19.

7

Texas and Arkansas, Louisiana, New Mexico, and Oklahoma.[37]   In fact, approximately 26% of Ace's Texas-based Crude Oil Drivers from December 19, 2018, to July 12, 2022, drove across state lines in connection with their work for Ace.[38]   Moreover, Escobedo and Martinez each admitted that they were going to drive a route on behalf of Ace that would have taken them across state lines (between Texas and Oklahoma), although they did not ultimately end up driving that route because Ace subsequently made the business decision that it was not necessary at that time.[39]

Given the above, Plaintiffs had a reasonable expectation that they could be assigned an interstate route at any time during their employment as Crude Oil Drivers at Ace.[40]   This is an **_undisputed_** fact, as Plaintiffs each <u>unequivocally</u> admitted in their depositions that they had a reasonable expectation of interstate travel:

- <u>Escobedo</u>: "Q: So, at all times when you were employed with Ace, you reasonably expected you could be assigned to drive a route that would cross state lines.  Correct?  A. Yes, sir."[41]

- <u>Lewis</u>: "Q: And so, at all times during your employment with Ace, you reasonably expected that you could be assigned to drive a route that would cross state lines.  Correct?  A. Yes."[42]

- <u>Alaniz</u>: "Q.  Okay.  And so, at all times during your employment with Ace, you reasonably expected that you could be assigned a route that would cross state lines?  A. Yes, sir."[43]

- <u>Martinez</u>: "Q. [Y]ou expected during your employment that you could be assigned a route by Ace that would take you across state lines, right?  A. Oh, yes."[44]

---

[37] Ex. 2, Weise Decl. at ¶ 13 and Ex. 2-F, ACE 000400–413 (summary of Crude Oil Driver trips); *see* Ex. 4, Escobedo Dep., at 37:20–38:9; Ex. 5, Alaniz Dep., at 40:17–20; Ex. 6, Lewis Dep., at 34:6–12.

[38] Ex. 2, Weise Decl. at ¶ 14 and Ex. 2-F, ACE 000400–413 (summary of Crude Oil Driver trips).

[39] Ex. 4, Escobedo Dep. at 37:8–19; Ex. 7, Martinez Dep. at 33:24–34:7.

[40] Ex. 2, Weise Decl. at ¶¶ 9–14; *see also* Ex. 4, Escobedo Dep., at 22:17–23:3; Ex. 5, Alaniz Dep., at 26:18–27:5; Ex. 6, Lewis Dep., at 23:7–19; Ex. 7, Martinez Dep., at 20:6–15 and 22:21–23:14.

[41] Ex. 4, Escobedo Dep. at 22:25–23:3.

[42] Ex. 6, Lewis Dep. at 23:15–19.

[43] Ex. 5, Alaniz Dep. at 27:1–5.

[44] Ex. 7, Martinez Dep. at 23:8–11.

**D.      Crude Oil Transported by Plaintiffs Left Texas Prior to Being Refined**

Based on Ace's contracts with its customers, Ace's Crude Oil Drivers, including Plaintiffs, delivered Ace's customers' allocation of crude oil to a certain pipeline, which entitled those Ace customers (or other end-market users to whom Ace's customers subsequently transferred the crude oil after Ace delivered it to the pipeline) to retrieve their monthly contractual volumes of crude oil from the pipeline terminal at the end of the pipeline.[45]  From there, these companies transport the crude oil to refineries, many of which are located outside of Texas.[46]

Importantly, Plaintiffs <u>admit</u> that when they transported crude oil for Ace, they did not know which end-market user would take possession of the crude oil they delivered to any particular pipeline, nor did they know where the end-market user took the crude oil or what the end-market user did with it after taking the crude oil out of the pipeline.[47]  Therefore, Plaintiffs <u>cannot</u> rebut Ace's evidence, detailed herein, regarding the ultimate destination of the crude oil before it is refined or otherwise processed.

**1.      Eagle Ford Crude**

Much of the crude oil that the Plaintiffs transported for Ace was South Texas Eagle Ford shale grade crude oil that was injected into pipelines, including primarily the Nustar pipeline, that terminate at or near the Port of Corpus Christi ("PCC") located in Corpus Christi, Texas.[48]  Eagle Ford grade crude oil is often exported to countries outside of the United States, and much of that crude oil leaves the country via ship from the Texas Gulf Coast, including from the PCC.[49]  Eagle

---

[45] Ex. 1, Mitchell Decl. at ¶ 5; Ex. 3, Lopez Decl. at ¶ 9.

[46] Ex. 1, Mitchell Decl. at ¶ 5; Ex. 3, Lopez Decl. at ¶¶ 16, 21–22.

[47] Ex. 4, Escobedo Dep. at 29:16–31:1 and 41:10–43:20; Ex. 5, Alaniz Dep. at 30:9–31:3 and 47:4–48:15; Ex. 6, Lewis Dep. at 25:20–27:9, 36:20–37:12, 38:20–25, and 39:23–40:12; Ex. 7, Martinez Dep. at 25:10–26:12.

[48] Ex. 1, Mitchell Decl. at ¶ 8; Ex. 3, Lopez Decl. at ¶¶ 17–18. The PCC is an entity that is authorized by Texas statute and is directed by a Port Commission composed of seven government-appointed port commissioners. TEX. SPEC. DIST. CODE §§ 5016.0001 *et seq.* (2021).

[49] Ex. 1, Mitchell Decl. at ¶¶ 8–10; Ex. 3, Lopez Decl. at ¶ 19.

Ford grade crude oil is also often refined domestically in refineries located outside of Texas, such as refineries in the Lake Charles, Louisiana and New Orleans, Louisiana areas, with much of that crude oil being transported via ship from the PCC.[50]  Given the limited capacity of the terminals at the end of the pipelines by which Eagle Ford crude oil flows to the PCC and other locations on the Texas Gulf Coast, the Eagle Ford crude oil injected into these pipelines is typically transported from the pipeline and on its way to its ultimate destination within the same month that the oil reaches the pipeline terminal.[51]

The PCC is a major hub for exporting crude oil, including Eagle Ford grade crude oil.[52]  In fact, in every month since February 2019 at least 68% of the outbound crude oil brought to the PCC was exported to foreign markets, and in most months during that time period the number exceeded 90%.[53]  Moreover, in every month since September 2019, the PCC has exceeded an average of one million barrels of outbound crude oil each day.[54]

Ace's crude oil customers during Plaintiffs' employment included BP Oil Supply Company ("BP"), CITGO Petroleum Corporation ("CITGO"), Occidental Petroleum Corporation ("Oxy"), Phillips 66 Company ("Phillips 66"), Shell Trading (US) Company ("Shell"), Trafigura Trading LLC ("Trafigura"), and Valero Energy Corporation ("Valero").[55]  Ace customers BP, Phillips 66, Shell, and Trafigura are exporters and/or free on board ("FOB") sellers of Eagle Ford crude oil and, since at least January 2019, have consistently purchased Eagle Ford crude oil, including from the Nustar pipeline, in order to have it exported to countries outside of the United States from the PCC.[56]  Additionally, Ace customers CITGO, Phillips 66, and Valero have

---

[50] Ex. 1, Mitchell Decl. at ¶¶ 8–10; Ex. 3, Lopez Decl. at ¶ 21.
[51] Ex. 3, Lopez Decl. at ¶ 20.
[52] Ex. 1, Mitchell Decl. at ¶¶ 9–10; Ex. 3, Lopez Decl. at ¶ 14.
[53] Ex. 1, Mitchell Decl. at ¶ 9 & Ex. 1-E (PCC's public crude oil export records).
[54] *Id.*
[55] Ex. 1, Mitchell Decl. at ¶¶ 2, 11 12, 16; *see generally* Ex. 1-A through Ex. 1-D (Plaintiffs' Driver Activity Logs).
[56] Ex. 1, Mitchell Decl. at ¶ 11; Ex. 3, Lopez Decl. at ¶ 21.

domestic refineries located outside of Texas, including in the Lake Charles, Louisiana and New Orleans, Louisiana areas and are known to have transferred Eagle Ford crude oil since January 2019 via ship from the PCC to such refineries.[57]  Thus, at least some of the Eagle Ford crude oil purchased by the aforementioned Ace customers since 2019, including Eagle Ford crude oil from allocations filled by Ace, was transported outside of Texas (including internationally) prior to being refined or otherwise processed.[58]

Each of the Plaintiffs transported Eagle Ford crude oil on behalf of Ace to fill allocations for several of the above-referenced customers, and delivered that crude oil to pipelines that terminated at or near the PCC, including the Nustar pipeline.[59]  Therefore, consistent with the customers' business and as confirmed by Ace's expert's opinion, at least some of the crude oil from the Ace allocations for those customers, which allocations were filled through crude oil delivered by Plaintiffs to those pipelines, was transported outside of Texas prior to being refined or otherwise processed.[60]

### 2.    WTI Crude

In addition to transporting Eagle Ford crude, Escobedo also transported West Texas Intermediate ("WTI") grade crude oil on behalf of Ace that was transported via pipeline either from Sunoco's Sunpet pipeline injection point or Ace's Midland station injection point, and which, therefore, terminated in either Oklahoma or the Texas Gulf Coast.[61]  WTI is highly desirable on the international market, and large volumes of WTI crude oil are exported outside of the United States on a daily basis, much of which leaves the country via ship from the Texas Gulf Coast,

---

[57] Ex. 1, Mitchell Decl. at ¶ 12; Ex. 3, Lopez Decl. at ¶ 22.
[58] Ex. 1, Mitchell Decl. at ¶ 13; Ex. 3, Lopez Decl. at ¶ 23.
[59] Ex. 1, Mitchell Decl. at ¶¶ 13, 21, 23–24, 26–27, 29–30, 32–33; Ex. 3, Lopez Decl. at ¶¶ 27, 29–30, 32–33, 35–36; *see generally* Ex. 1-A through Ex. 1-D (Plaintiffs' Driver Activity Logs).
[60] Ex. 1, Mitchell Decl. at ¶¶ 13, 22, 25, 28, 32; Ex. 3, Lopez Decl. at ¶¶ 28, 31, 34, 37.
[61] Ex. 1, Mitchell Decl. at ¶¶ 14, 19 & Ex. 1-A (Escobedo Driver Activity Log); Ex. 3, Lopez Decl. at ¶¶ 12–13, 24–25.

including from the PCC.[62]  Given the limited capacity of the terminals at the end of the pipelines by which WTI crude oil flows to the PCC and other locations on the Texas Gulf Coast, the WTI crude oil injected into these pipelines is typically transported from the pipeline and on its way to its ultimate destination within the same month that the oil reaches the pipeline terminal.[63]

The crude oil transported by Escobedo in West Texas was used to fill allocations for Ace customers Oxy, Phillips 66, Shell, and Trafigura.[64]  These customers are exporters and/or FOB sellers of WTI crude oil and, since at least January 2019, these companies have consistently purchased WTI crude oil to load onto vessels, from where it is typically exported to countries outside of the United States.[65]  Thus, a significant amount of the WTI crude oil purchased by these companies since 2019, including WTI crude oil they purchased from Ace, was exported outside of Texas prior to being refined or otherwise processed.[66]  Therefore, consistent with the customers' business and as confirmed by Ace's expert's opinion, at least some of the crude oil from Ace allocations for those customers, which allocations were filled through WTI crude oil delivered by Escobedo, was transported outside of Texas prior to being refined or otherwise processed.[67]

## VI.      ARGUMENT AND AUTHORITIES

### A.      Summary Judgment Standard

"A party is entitled to summary judgment if it can demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law."  *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  "Summary judgment is not a disfavored

---

[62] Ex. 1, Mitchell Decl. at ¶¶ 15–16; Ex. 3, Lopez Decl. at ¶¶ 14, 16.
[63] Ex. 3, Lopez Decl. at ¶ 15.
[64] Ex. 1, Mitchell Decl. at ¶ 19; Ex. 3, Lopez Decl. at ¶ 25. Additionally, Sunoco purchased West Texas crude Ms. Escobedo transported for Ace and injected into the Sunoco pipeline at the Sunpet station, which from there was very likely transported via pipeline to the Texas Gulf Coast.  *Id.*
[65] Ex. 1, Mitchell Decl. at ¶ 16; Ex. 3, Lopez Decl. at ¶ 16.
[66] Ex. 1, Mitchell Decl. at ¶¶ 16–17; Ex. 3, Lopez Decl. at ¶ 16.
[67] Ex. 1, Mitchell Decl. at ¶¶ 17, 20; Ex. 3, Lopez Decl. at ¶¶ 16, 26.

procedural shortcut, but rather an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Id.* (quotations omitted). The party opposing summary judgment "may not rest upon mere allegations contained in the pleadings" or "unsubstantiated assertions," but rather must "identify specific evidence in the record and articulate the precise manner in which that evidence supports his or her claim." *Id.*

## B.   Plaintiffs Were Exempt From The FLSA's Overtime Requirement Under the MCA Exemption

The FLSA requires employers to pay non-exempt employees one and a half times their regular rate of pay for time spent working beyond forty hours in a week.  29 U.S.C. § 207(a)(1). However, the FLSA's overtime requirement does not apply to employees who are exempt from such requirement under the MCA exemption.  *Id.* at § 213(b)(1).  For the MCA exemption to apply, the employee must: (1) be employed by a motor carrier or motor private carrier, as defined in 49 U.S.C. § 13102; (2) be engaged in activities directly affecting motor vehicle safety; and (3) be engaged in activities involving the transportation of goods in interstate or foreign commerce. *Vallejo v. Garda CL Southwest, Inc.*, 56 F. Supp. 3d 862, 868 (S.D. Tex. 2014) (Rosenthal, J.) (citing 29 C.F.R. § 782.2); *see also Rychorcewicz*, 768 F. App'x at 255.[68]

The first two elements of the MCA exemption are easily met and do not appear to be contested.[69]  <u>First</u>, Plaintiffs were employed by Ace, which (as discussed above) is a registered motor carrier with the DOT and falls within the MCA's definition of "motor private carrier" because it transports crude oil that it buys from producers and sells to its customers in interstate

---

[68] "The Supreme Court recently clarified that courts are to give FLSA exemptions 'a fair reading,' as opposed to the narrow interpretation previously espoused." *Rychorcewicz*, 768 Fed. App'x at 254 (quoting *Carley v. Crest Pumping Techs., L.L.C.*, 890 F.3d 575, 579 (5th Cir. 2018)).  Moreover, the MCA is "a remedial statute and should … be broadly construed." *Galbreath v. Gulf Oil Corp.*, 413 F.2d 941, 946 (5th Cir. 1969) (citing *Crescent Express Lines v. United States*, 320 U.S. 401, 409 (1943)).

[69] *See* ECF No. 1, Plaintiff's Original Complaint at ¶¶ 10, 19, 20 (alleging that Ace's "primary business involves purchasing and delivering crude oil" and that as "Crude Haulers" for Ace, Plaintiffs were "primarily responsible for transporting crude oil").

commerce.[70] 49 U.S.C. § 13102(15) (defining "motor private carrier" as "a person … transporting property by motor vehicle when (A) the transportation is [interstate] as provided in section 13501 of this title; (B) the person is the owner, lessee, or bailee of the property being transported; and (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise"); *see also Martinez v. Environmental Oil Recovery, Inc.*, No. 6:20-CV-00513-JCB-KNM; 2021 WL 7084165, at *6 (E.D. Tex. Dec. 14, 2021) ("Defendant is a registered motor carrier with the DOT. Therefore, Defendant is subject to the DOT's jurisdiction."); *Rychorcewicz*, 768 Fed. App'x at 255 (affirming district court's judgment that defendant was "subject to the DOT's jurisdiction because it is a registered motor carrier").

<u>Second</u>, Plaintiffs admit that, as Crude Oil Drivers for Ace, they were engaged in activities directly affecting motor vehicle safety because they drove commercial motor vehicles weighing well over 10,000 pounds on public highways,[71] transporting a hazardous material, and their work could result in serious injury or death if Plaintiffs did not perform their jobs safely.  29 C.F.R. § 782.2(b)(2) (the MCA exemption is applicable to "driver[s]" whose work directly affects "the safety of operation of motor vehicles on the public highways in transportation in interstate or foreign commerce within the meaning of the [MCA]"); *see also, e.g.*, *Martinez*, 2021 WL 7084165 at *6 ("[A]s a driver, there is no question that Plaintiff engaged in safety affecting activities").

As for the third element of the MCA exemption, employees are exempt if the motor private carrier they work for "engages in interstate commerce by either actually transporting goods across state lines or transporting within a single state goods that are in the flow of interstate commerce."

---

[70] Such transportation is in interstate commerce since, as discussed herein, (1) many of Ace's Crude Oil Drivers actually cross state lines while transporting the crude oil; and (2) even where the Ace driver does not cross state lines, much of the crude oil they place into pipelines leaves the state prior to it being refined or otherwise processed.
[71] Thus, there is no dispute that Plaintiffs do not fall within the "small vehicle" exception to the MCA exemption. *See, e.g.*, *Vallejo*, 56 F. Supp. 3d at 869 (plaintiffs qualified for MCA exemption where the "undisputed evidence in the summary judgment record shows that [defendant] provides motor vehicle transportation for compensation and operates in interstate commerce, and that the plaintiffs operated vehicles weighing more than 10,000 pounds").

*Vallejo*, 56 F. Supp. 3d at 870 (quoting *Barefoot v. Mid-America Dairymen, Inc.*, 16 F.3d 1216, 1994 WL 57686, at *2 (5th Cir. 1994)).   Drivers also independently qualify for the MCA exemption if they can reasonably expect to make an interstate trip on behalf of their employer consistent with their job duties.   *Rychorcewicz*, 768 Fed. App'x at 255–56; *Allen v. Coil Tubing Services, L.L.C.*, 755 F.3d 279, 284 (5th Cir. 2014).   The undisputed evidence in this case confirms that <u>both</u> of the foregoing independent methods of establishing the "interstate commerce" element of the MCA exemption as to the Plaintiffs' work for Ace as Crude Oil Drivers are met.

### 1.   Plaintiffs transported crude oil within a continuous flow of interstate commerce

"Employers who transport solely within a single state are subject to the Secretary of Transportation's jurisdiction where the transportation is part of a 'practical continuity of movement' across state lines."   *Glanville v. Dupar, Inc.*, No. H–08–2537, 2009 WL 3255292, at *9 (S.D. Tex. Sept. 25, 2009) (Rosenthal, J.).   In other words, for purposes of the MCA exemption's applicability, "[t]he result [of a determination of exempt status] is no different where the vehicles do not actually cross State lines but operate solely within a single State, if what is being transported is actually moving in interstate commerce."   *Vallejo*, 56 F. Supp. 3d at 870. Importantly, the Fifth Circuit has explained that the MCA is "a remedial statute and should … be broadly construed."   *Galbreath*, 413 F.2d at 946; *see also Levinson v. Spector Motor Serv.*, 330 U.S. 649, 662, 681 (1947) (explaining that "it is the intent of the Fair Labor Standards Act to give <u>full recognition to the safety program of the Motor Carrier Act</u>" and, accordingly, courts must "give full effect to the safety program to which Congress has attached primary importance, even to the corresponding exclusion by Congress of certain employees from the benefits of the compulsory overtime pay provisions of the Fair Labor Standards Act" (emphasis added)).

Plaintiffs transported crude oil in Texas, but there is no dispute that such crude oil was often bound for destinations outside of Texas, before being refined or otherwise processed. Petroleum products like crude oil have long been recognized as an interstate product.  *E.g.*, *Galbreath v. Gulf Oil Corp.*, 413 F.2d 941, 945 (5th Cir. 1969) (affirming ruling that "petroleum products were continuously moving in interstate commerce until they reached" their ultimate destination); *see also Rychorcewicz*, 768 F. App'x at 253 (employees exempt under MCA exemption where employer was "a motor carrier to transport oil-field equipment, machinery, and large objects").  Moreover, as discussed above, Plaintiffs transported the crude oil in Texas and injected it into pipelines for the specific purpose of fulfilling Ace's allocation contracts with its customers, many of which (1) are in the business of exporting crude oil internationally and/or refining crude oil in locations outside of Texas; and (2) actually took crude oil from their Ace allocations, which allocations were filled through crude oil delivered by the Plaintiffs to pipelines in Texas, and transported the crude oil to destinations outside of Texas, as confirmed by the undisputed evidence and Ace's expert's opinion.  *See Glanville*, 2009 WL 3255292 at *10 (explaining that intrastate transportation of goods with an out-of-state origin or destination qualifies as interstate under the MCA exemption "when a product is shipped from out-of-state pursuant to a specific customer order" for a specific quantity of product).[72]  And, the crude oil Plaintiffs transported was not altered in any way until after it completed its journey at these out-of-state refineries, as discussed above. *See Vallejo*, 56 F. Supp. 3d at 872 (transportation was in

---

[72] The analysis is the same where, as here, "the claimed intrastate leg of the trip is at the beginning instead of the end of the journey." *Opelika Royal Crown Bottling Co. v. Goldberg*, 299 F.2d 37, 41 (5th Cir. 1962); *see also, e.g.*, 29 C.F.R. § 782.7(b)(1) ("[t]he fact that other carriers transport it out of or into the State is not material" (emphasis added)); *Baez v. Wells Fargo Armored Service Corp.*, 938 F.2d 180, 182 (11th Cir. 1991) (holding that intrastate drivers who never crossed state lines qualified for MCA exemption where the instruments they transported were bound for banks outside the state); *Bolar v. Southern Intermodal Xpress*, No. 1:17-00360-JB-B, 2019 WL 4738792, at *13 (S.D. Ala. Sept. 27, 2019) (holding that drivers "completed one leg of a larger interstate shipment" where they transported finished paper goods from a mill to the distribution center, "where the goods continued to their final destinations . . . throughout the United States, including" out-of-state destinations and customers).

16

interstate commerce where "[t]he undisputed record evidence shows that the processing that the plaintiffs alleged occurred … happened after the [plaintiffs] transported the currency and coins"). Therefore, Plaintiffs' transportation of the crude oil was part of the "practical continuity of movement" of the crude oil in interstate commerce. *Vallejo*, 56 F. Supp. 3d at 873 ("the regular course of the plaintiffs' duties as driver … was to engage in transportation that was part of the practical continuity of movement across state lines" and therefore qualified for MCA exemption).

In an analogous case, this Court held that armored truck drivers who transported checks and cash for their employer only in Texas, were exempt under the MCA exemption since "some of these checks were destined for banks outside of the State of Texas." *Vallejo*, 56 F. Supp. 3d at 872.  Importantly, this Court <u>rejected</u> plaintiffs' argument "that the out-of-state checks made up only a small part of the plaintiffs' armored vehicle deliveries," explaining that such "argument is not supported by precedent" and "the character of the activities, not the percentage of the work day they occupy, is the important factor." *Id.*  This case presents the same factual scenario: Plaintiffs transported crude oil in Texas, at least some of which was bound for refineries outside of Texas.  As such, the result should be the same as in *Vallejo* and this Court should find that Plaintiffs' transportation of crude oil was part of a continuous flow of such crude oil in interstate commerce and that, thus, Plaintiffs were exempt under the MCA exemption.

Similarly, in *Opelika*, the Fifth Circuit held that driver-helpers who transported bottles intrastate for the ultimate "purpose of sending them" to a bottling plant outside the state, qualified for the MCA exemption.  *Opelika*, 299 F.2d 37, 41 at 42–43.  Analogously here, Plaintiffs transported crude oil in Texas to fulfill Ace's allocations for certain customers for the ultimate "purpose of sending" the crude oil to refineries located in other states and/or internationally.  As

the Fifth Circuit found under similar circumstances in *Opelika*, this confirms that the crude oil was moving in a continuous flow of interstate commerce.

Finally, in another analogous case, *Galbreath v. Gulf Oil Corp.*, the Fifth Circuit held that drivers who transported petroleum products from a bulk plant to retail customers without crossing state lines were exempt under the MCA. *Galbreath*, 413 F.2d at 947. The driver-plaintiffs in *Galbreath* were employed at Gulf's bulk plant in Georgia, from which petroleum products were distributed to Gulf's retail service stations in the area. *Id.* at 942. The products were first shipped from Gulf's refineries in Texas and Mississippi to Georgia through pipelines co-owned by Gulf and other oil companies, after which they "were loaded into trucks driven by plaintiffs at the [bulk plant] loading rack" and delivered to the local retail service stations. *Id.* at 942–43. As here, the petroleum products were not processed in any way during this transportation. *Id.* at 943. Under those facts (which are strikingly similar to this case), the Fifth Circuit found that since the "products were shipped on the basis of contractual commitments with customers" and were not processed along the way, the products were in practical continuity of transit from when they left Gulf's out-of-state refineries until they were delivered to the intended service stations in Georgia, thereby qualifying the Georgia drivers for the MCA exemption. *Id.* at 947. Similarly here, Plaintiffs transported the crude oil in Texas based on Ace's contractual commitments with its customers, many of whom subsequently transported the crude oil from their Ace allocations to refineries outside of Texas before the crude oil was processed or altered in any way. Thus, the crude oil transported by Plaintiffs is in the continuous flow of interstate commerce in the same way as the petroleum products the Fifth Circuit found to be in a continuous flow of interstate commerce in *Galbreath*.

18

Notably, the fact that the crude oil transported by Plaintiffs was "fungible" and, therefore, unable to be specifically traced to its ultimate destination is irrelevant to the analysis. *Galbreath.*, 413 F.2d at 946 (unequivocally "reject[ing] any … distinction" where, as here, the product at issue is "fungible" in nature). Rather, all that is necessary is that at least some of the product be intended for destinations outside the state before being processed, which is undisputedly the case as to the crude oil transported by Plaintiffs here. *E.g.*, *Century Indem. Co. v. Carlson*, 133 F.3d 591, 593–94, 598 (8th Cir. 1998) (finding that intrastate transportation of farmer's corn to river terminal was part of interstate commerce for purposes of MCA applicability, despite the fact that "the fungible nature of corn makes it impossible to connect any particular shipment of corn to any individual farmer," where "[m]ost corn leaves the [river] terminal for interstate ports" and the farmer "knew that the journey to that terminal was part of the interstate transportation of the grain itself, even though he had no control over where [the purchaser] would ultimately send the grain"); *Craft v. Ray's, LLC*, No. 1:08-CV-627-RLY-JMS, 2009 WL 3163148 (S.D. Ind. Sept. 29, 2009) (holding FLSA plaintiffs qualified for the MCA exemption where they transported recyclable materials intrastate and "[w]ell over fifty percent of the recyclables … are sold to out-of-state recipients," since even though defendants "do not know in advance the ultimate destination of specific loads of recyclables transported by [plaintiffs], they do know that a large portion of each load will ultimately go out-of-state").[73]

Given the above, there is no question that Plaintiffs' transportation of crude oil was part of its "practical continuity of movement" in interstate commerce, which establishes the third and final

---

[73] *See also, e.g.*, *Edwards v. Aramark Unif. & Career Apparel, LLC*, No. 14 C 8482, 2016 WL 236241, at *11 (N.D. Ill. Jan. 19, 2016) (holding FLSA plaintiffs qualified for the MCA exemption despite the fact that only about 6.7% of the goods they delivered were coming from out-of-state locations and were commingled with intrastate goods in transit, explaining that "[i]f it is known that some portion of a particular load is moving in interstate commerce, whether or not this is an identifiable portion of the load, the trip will be viewed as an interstate trip and therefore subject to the jurisdiction of the DOT") (emphasis added).

element of the MCA exemption.  As this Court has previously held in several cases, Plaintiffs'
attempted reliance on the fact that they only physically drove crude oil within the State of Texas
is legally insufficient to avoid summary judgment as to the interstate commerce element of the
MCA exemption and, thus, Ace is entitled to summary judgment in its favor as a matter of law.
*See, e.g.*, *Vallejo*, 56 F. Supp. 3d at 873 (granting summary judgment to FLSA defendant on MCA
exemption where "[t]he undisputed evidence and the clear law lead to the conclusion that the
regular course of the plaintiffs' duties … was to engage in transportation that was part of the
practical continuity of movement across state lines"); *Glanville*, 2009 WL 3255292, at *12 (same).

### 2.    Plaintiffs reasonably expected to drive across state lines

The "interstate commerce" element of the MCA exemption is independently established in
this case because Plaintiffs reasonably expected to drive across state lines as part of their work as
Crude Oil Drivers for Ace.  The relevant inquiry as to the "reasonable expectation" prong of the
MCA's interstate commerce element is not whether any particular driver ever drove interstate
routes, but whether the employees, "on a company-wide basis, could reasonably have been
expected to drive in interstate commerce consistent with their job duties." *Rychorcewicz*, 768 Fed.
App'x at 255–56 (quotations omitted).  This is so "even if, in doing so, the effect is to apply the
MCA exemption to employees who rarely, or *never*, engage in interstate commerce." *Amaya v.
NOYPI Movers, L.L.C.*, 741 F. App'x 203, 206 (5th Cir. 2018) (quotations omitted).  "[W]hen
evaluating the nature of work from a class-wide perspective, [courts] do not require a particularly
high concentration of qualifying work in order to meet the MCA exception." *Id.*  In fact, courts
have applied the MCA exemption to classes of employees even where as little as 2.75% of the
class of employees' work involved interstate transport. *Id.* (collecting cases); *see also, e.g.*, *Allen*,
755 F.3d at 285–88 (finding a reasonable expectation that plaintiffs could be assigned to drive

interstate even though only "7 percent of projects company-wide required this class of employees to cross state lines").

In evaluating whether a reasonable expectation of interstate travel exists, the Fifth Circuit in *Olibas v. Barclay* identified 8 non-dispositive factors courts should consider:

> (1) whether all employees in the class have similar job duties, even if only some employees in the class make interstate trips; (2) whether the employer regularly sends some drivers to interstate destinations; (3) whether the employer requires its drivers to meet DOT requirements; (4) whether and with what frequency project assignments are subject to change; (5) whether the drivers' assignments are given via dispatch based on customer need; (6) whether drivers have fixed or dedicated routes; (7) whether assignments are distributed indiscriminately; and (8) whether drivers risk termination for refusing trips from dispatch.

*Olibas v. Barclay*, 838 F.3d 442, 449 n.11 (5th Cir. 2016).

Plaintiffs clearly had a reasonable expectation that they could be assigned interstate routes under the above factors.  As an initial matter, each of the Plaintiffs unequivocally admitted in their depositions that they had a reasonable expectation of interstate travel at all times during their employment with Ace, and Plaintiffs' Offer Letters from Ace explicitly stated that they should reasonably expect to drive interstate routes.  Moreover, as the undisputed evidence shows, (1) Ace's Crude Oil Drivers, including Plaintiffs, all had similar job duties—transporting crude oil— regardless of whether they made an interstate trip; (2) Ace regularly sends Crude Oil Drivers across state lines, as confirmed by the fact that approximately <u>26%</u> of Ace's Texas Crude Oil Drivers drove at least one interstate assignment during the last three years, well exceeding the percentages found sufficient as a matter of law to support a reasonable expectation of interstate driving;[74] (3) Ace requires its Crude Oil Drivers to meet DOT requirements, as Plaintiffs admit; (4) Plaintiffs' and other Crude Oil Drivers' driving assignments were regularly subject to change, again as Plaintiffs admit; (5) Ace's Crude Oil Drivers were given assignments via dispatch and based on

---

[74] *Amaya*, 741 Fed. App'x at 206; *Allen*, 755 F.3d at 285–88.

customer need, as Plaintiffs also admit; (6) the Crude Oil Drivers did not drive fixed or dedicated routes, as Plaintiffs admit; (7) if interstate routes had to be assigned after all Texas Crude Oil Drivers were offered the opportunity, they would be assigned indiscriminately among the Texas Crude Oil Drivers; and (8) Ace's Crude Oil Drivers risked termination for refusing trips that were assigned to them, which Plaintiffs again admit.

In other words, <u>all eight</u> of the *Olibas* factors weigh in favor of a finding that Plaintiffs (like all Ace Crude Oil Drivers) reasonably expected they could be assigned to drive across state lines in connection with their regular job duties for Ace. *See, e.g.*, *Ramos v. Captain Corp.*, No. MO:16–CV–00075–RAJ–DC, 2017 WL 3712345, at **6–7 (W.D. Tex. Jul. 7, 2017) (holding that a Plaintiff who did not drive out of Texas could reasonably have been expected to drive in interstate commerce, where (1) the "Defendant engaged in the transport of hazardous materials and equipment in interstate commerce during the relevant time period," (2) the "Plaintiff testified in his deposition that he understood when he was hired by Defendant that he might have to make out-of-state trips during his employment," (3) the "Plaintiff's continuing duties were to accept assignments to haul equipment and hazardous materials in his assigned vehicle to Defendant's client's jobsite . . . even though there were times when they were not assigned to transport property in interstate commerce," and (4) "any driver could have been assigned to an interstate trip"); *Locas v. NOYPI, Inc.*, No. H–11–1940, 2012 WL 4754729, at *8 (S.D. Tex. Oct. 3, 2012) (granting summary judgment to defendants under the MCA in part because "employees such as Plaintiffs were expected, if asked, to travel within the state of Texas and across state lines to transport customer property," even though "[w]hether Plaintiffs actually performed work across state lines is disputed").[75]

---

[75] *See also, e.g.*, *Songer v. Dillon Res., Inc.*, 618 F.3d 467, 475 (5th Cir. 2010) (affirming district court's finding that plaintiffs were exempt under the MCA in part because "drivers were assigned routes via dispatcher, . . . the pick-up

Plaintiffs' reasonable expectation that they could be assigned interstate routes as Crude Oil Drivers for Ace independently establishes the interstate commerce requirement for the MCA exemption.  As such, for this reason as well, Ace is entitled to summary judgment in its favor.

### VII.  CONCLUSION

For the foregoing reasons, Ace respectfully requests that the Court grant its motion for summary judgment and dismiss all of Plaintiffs' claims in this lawsuit with prejudice, and grant Ace all other relief to which it is justly entitled.

**Dated: August 19, 2022**

By: */s/ Mark D. Temple*
    Mark D. Temple, a*ttorney-in-charge*
    Texas Bar No. 00794727
    Southern District ID No. 19552
    Peter J. Stuhldreher, *of counsel*
    Texas Bar No. 24056393
    Southern District ID No. 699821
    Paul M. Knettel, *of counsel*
    Texas State Bar No. 24102031
    Southern District ID No. 3005240
    Emil M. Sadykhov, *of counsel*
    Texas Bar No. 24110316
    Southern District ID No. 3385031
    **BAKER & HOSTETLER LLP**
    811 Main Street, Suite 1100
    Houston, Texas 77002
    Phone: (713) 751-1600
    Facsimile: (713) 751-1717
    mtemple@bakerlaw.com
    pstuhldreher@bakerlaw.com
    pknettel@bakerlaw.com
    esadykhov@bakerlaw.com

    **ATTORNEYS FOR DEFENDANT**
    **ACE GATHERING, INC.**

---

location, specific route, load, and destination were assigned indiscriminately based on various factors," and, "[i]n their deposition testimony, several drivers testified that they understood when they were hired by the [ ] companies that they might have to make out-of-state trips during their employment"); *Rychorcewicz v. Welltec, Inc.*, No. H-16-2, 2018 WL 3559131, at *12 (S.D. Tex. Jun. 22, 2018), *aff'd*, 768 Fed. App'x. 252 (5th Cir. 2019) (holding that plaintiffs were exempt under the MCA where "[t]he evidence in this case appears undisputed that the field engineers' job descriptions required that they could be called upon regularly to make trips in interstate commerce").

## <u>CERTIFICATE OF SERVICE</u>

In accordance with the Federal Rules of Civil Procedure, I hereby certify that on August 19, 2022, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send notice of this filing to all counsel of record:

Colby Qualls
Josh Sanford
Sanford Law Firm, PLLC
10800 Financial Centre Pkwy, Suite 510
Little Rock, Arkansas 72211
colby@sanfordlawfirm.com
josh@sanfordlawfirm.com

*/s/ Mark D. Temple*
Mark D. Temple
